YOUNG, D.J.
*32 I. INTRODUCTION
Former plaintiff Friends of Ruth & Emily, Inc. ("Friends") filed suit against the defendant City of New Bedford ("New Bedford"), alleging that New Bedford's city zoo committed an unlawful taking under the Endangered Species Act. After New Bedford moved to dismiss the complaint for lack of proper legal representation, Joyce Rowley ("Rowley") substituted herself as plaintiff, rendering the issue moot. ECF Nos. 18, 23. This Court withheld judgment on the motion, however, asking the parties instead to brief the issue of standing. ECF No. 30. Satisfied that Rowley does indeed have the requisite standing to maintain this suit at this stage of the litigation, the Court now DENIES New Bedford's motion to dismiss.
A. Procedural History
On September 21, 2017, Friends filed a complaint against New Bedford in this Court under its federal question jurisdiction. Compl. Decl. & Inj. Relief ("Compl.") ¶ 25. New Bedford moved to dismiss the complaint on October 16, on the basis that Rowley, the non-attorney founder and president of Friends, could not represent Friends in a federal lawsuit. Mot. Dismiss Pl.'s Compl. ("Mot. Dismiss"), ECF No. 7. Friends opposed the motion, Resp. Opp'n Def.'s Mot. Dismiss ("Opp'n Mot. Dismiss"), ECF No. 14, and moved for a preliminary injunction on December 12, Mot. Prelim. Inj., ECF No. 16. That day, this Court heard oral argument on the motion to dismiss and granted a conditional dismissal, allowing Friends thirty days to retain proper counsel. See ECF No. 18.
On February 12, 2018, Rowley moved to intervene, which this Court allowed as a motion to substitute the plaintiff. See ECF Nos. 21, 23. Rowley then renewed Friends' previous motion for a preliminary injunction. See ECF Nos. 27, 28. Concerned about Rowley's standing to maintain suit, this Court requested briefing on the issue, which both parties duly provided. See Pl.'s Br. Supp. Pl.'s Standing ("Pl.'s Mem."), ECF No. 31; Def.'s Mem. Law Supp. Mot. Dismiss ("Def.'s Mem."), ECF No. 33.
B. Facts Alleged
Rowley alleges maltreatment of two Asian elephants, named Ruth and Emily, at the Buttonwood Park Zoo (the "Zoo") in New Bedford. Compl. ¶¶ 7-8. Rowley is the founder and president of Friends, a "nonprofit organization and [ ] public charity" consisting of "dozens" of members supporting the effort to shut down the Zoo's elephant exhibit and transfer Ruth and Emily to an elephant sanctuary in Tennessee. Id. ¶¶ 2, 13. Rowley is also a member of the Buttonwood Park Zoological Society and visits the Zoo on a "near daily basis" to observe Ruth and Emily. Id. ¶ 14. Rowley alleges that she has formed "an aesthetic, emotional, and spiritual relationship with Ruth and Emily over the years." Id. ¶ 15.
Rowley alleges that the Zoo has harmed Ruth and Emily in several ways, such as by chaining their legs to restrain them overnight; failing to protect Ruth from attacks by Emily (it is allegedly "well documented" that the two elephants do not get along); housing them in inadequate facilities; failing to provide the elephants with sufficient socialization opportunities; and failing to provide adequate veterinary care. Id. ¶¶ 36-65. Rowley claims that the Zoo's treatment of Ruth and Emily violates Section 9 of the Endangered Species Act, which prohibits the "taking" of any endangered species and the possession of any endangered species unlawfully taken. Id. ¶¶ 78-79. Rowley requests that this Court *33 declare that the Zoo's treatment of Ruth and Emily violates the Endangered Species Act and enjoin the Zoo from committing any further violations. Id. at 25.
II. LEGAL STANDARD
As Justice Scalia explained in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) :
[O]ur cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
Id. at 560-61, 112 S.Ct. 2130 (citations omitted) (first quoting Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), then quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), then quoting Simon, 426 U.S. at 38, 43, 96 S.Ct. 1917 ). While "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," the severity of this burden varies depending on the stage of litigation. Id. at 561, 112 S.Ct. 2130. "At the pleading stage," for example, "general factual allegations of injury resulting from the defendant's conduct may suffice." Id.
Here, Rowley brings her suit under the Endangered Species Act, 16 U.S.C. §§ 1531 - 44, which expressly authorizes citizen suits for injunctive relief. See id. § 1540(g)(1). Thus, she may bring such a suit if she has standing. Since this case has not proceeded beyond the motion to dismiss stage, Rowley "must clearly allege facts demonstrating standing; [this Court] then construe[s] those facts and reasonable inferences drawn from them in [her] favor." Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010).
III. ANALYSIS
A. Injury in Fact
While "there is ordinarily little question" of injury when a plaintiff is herself the object of the government action she challenges, in certain cases, such as those arising under the Endangered Species Act, the plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else." Lujan, 504 U.S. at 561-62, 112 S.Ct. 2130. In these cases, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Id. (quoting Allen v. Wright, 468 U.S. 737, 758, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ).
The Supreme Court has noted that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." Id. at 562-63, 112 S.Ct. 2130. A plaintiff must show, however, that she is herself suffering an injury to that interest -- in other words, that she is " 'directly' affected apart from [her] 'special interest in th[e] subject.' " Id. at 563, 112 S.Ct. 2130 (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ). In Sierra Club, where this idea was articulated in the similar environmental protection context, the plaintiff sought a declaratory judgment *34 that a proposed development through part of Sequoia National Park violated federal law governing the preservation of natural parks, forests, and game refuges. 405 U.S. at 730, 92 S.Ct. 1361. The Supreme Court held that the plaintiff failed to establish injury in fact because, while "[t]he alleged injury will be felt directly ... by those who use [the area], and for whom the aesthetic and recreational values of the area will be lessened," the plaintiff "failed to allege that it or its members would be affected in any of their activities or pastimes by the ... development." Id. at 735, 92 S.Ct. 1361. The plaintiff did not assert "that its members use [the area] for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions," and its "mere 'interest in a problem,' no matter how longstanding," was not sufficient to confer standing. Id. at 735, 739, 92 S.Ct. 1361.
The Supreme Court again rejected claims of injury in fact in Lujan, where an organization challenged a federal regulation interpreting the Endangered Species Act not to apply to agency actions taken in foreign nations. 504 U.S. at 558, 112 S.Ct. 2130. The plaintiff relied on affidavits from two of its members, each stating that the member had traveled to a foreign country (one to Egypt, the other to Sri Lanka) on one occasion and observed the habitat of an endangered species, intended to do so again, and would suffer harm from the reduced chance of observing the species on that future visit due to the agency action. See id. at 563-64, 112 S.Ct. 2130. The Supreme Court explained, "[t]hat the women 'had visited' the areas of the projects before the projects commenced proves nothing," and "[s]uch 'some day' intentions" to return, "without any description of concrete plans, or indeed even any specification of when the some day will be[,] do not support a finding of the 'actual or imminent' injury that our cases require." Id. at 564, 112 S.Ct. 2130.
In so holding, the Supreme Court rejected the "animal nexus" approach, under which "anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing," and the "vocational nexus" approach, under which "anyone with a professional interest in such animals" has standing. Id. at 566, 112 S.Ct. 2130. Justice Scalia remarked:
Under these theories, anyone who goes to see Asian elephants in the Bronx Zoo, and anyone who is a keeper of Asian elephants in the Bronx Zoo, has standing to sue because the Director of the Agency for International Development (AID) did not consult with the Secretary regarding the AID-funded project in Sri Lanka. This is beyond all reason.... It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist. It is even plausible -- though it goes to the outermost limit of plausibility -- to think that a person who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that might have been the subject of his interest will no longer exist. It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.
Id. at 566-67, 112 S.Ct. 2130 (citing Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 231, n.4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) ).
*35 By contrast, the plaintiffs in Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), established standing for their claims concerning a facility's unlawful discharge of pollutants into a river. There, the Supreme Court held that the plaintiffs adequately demonstrated injury in fact with evidence that they lived near the facility and would have liked to fish, hike, wade, camp, or canoe near or in the river, but refrained from doing so for fear that the water contained harmful pollutants. Id. at 181-83, 120 S.Ct. 693. It noted that Sierra Club"held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Id. at 183, 120 S.Ct. 693. The Friends of the Earth Court went on to distinguish the plaintiffs' conditional statements (that they would use the river were it not for the pollution) from "the speculative 'some day intentions' " in Lujan. Id. at 184, 120 S.Ct. 693 (quoting Lujan, 504 U.S. at 564, 112 S.Ct. 2130 ).
The First Circuit followed the example set by Friends of the Earth in Animal Welfare Institute v. Martin, 623 F.3d 19, 25 (1st Cir. 2010), where it concluded that standing requirements were satisfied. There, the plaintiff organizations challenged Maine's trapping regulations as harmful to Canada lynx in the area. Id. at 22-23. The First Circuit had no trouble concluding that the plaintiffs had alleged injury in fact, observing:
Plaintiffs' affidavits from members who are Maine residents assert the members frequently visit wildlife refuges and parks in Maine to try to observe lynx and other wildlife species. This "desire to use or observe an animal species ... is undeniably a cognizable interest for purpose of standing." The members also allege a cognizable injury to this interest: that Maine's trapping regulations ... interfere with the Canada lynx's natural state and may increase the animals' risk of death, reducing the likelihood that the members will observe Canada lynx in their natural state on future visits.
Id. at 25 (quoting Lujan, 504 U.S. at 562-63, 112 S.Ct. 2130 ). Similarly, in Strahan v. Coxe, 939 F.Supp. 963 (D. Mass. 1996) (Woodlock, J.), vacated in part on other grounds, 127 F.3d 155 (1st Cir. 1997), Judge Woodlock held that the plaintiff had shown injury in fact from his testimony that "he regularly observes whales in Massachusetts waters," since "[r]egular observation of endangered whales in Massachusetts waters is a cognizable interest for standing purposes." Id. at 978. Judge Woodlock also explained that the plaintiff's affidavits, in which he testified that he "routinely go[es] 'whale watching' in New England," is a "conservation biologist specializing in the conservation and recovery of endangered species," and "is engaged in scientific research on the Northern Right whale," separately sufficed to support a finding that the plaintiff had a cognizable interest. Id.
Another relevant case from this circuit determining allegations of injury in fact to be insufficient is not inconsistent with these opinions. In Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium, 836 F.Supp. 45 (D. Mass. 1993) (Wolf, J.), the plaintiffs alleged that the transfer of a particular dolphin named Kama from the New England Aquarium caused their members to suffer harm from the deprivation of the opportunity to observe and study Kama. Id. at 50-51. Judge Wolf held that the plaintiffs had not demonstrated injury in fact from the affidavits of two of their members stating that they "attended dolphin shows and saw dolphins *36 on public display [at the Aquarium] several times" while Kama was at the Aquarium. Id. at 52. Judge Wolf noted that the affiants failed to state "either that they have returned to the Aquarium and have suffered injury because of Kama's absence, or intend to return in the near future." Id. Further, they did not "state that they ever observed Kama in particular, as opposed to dolphins in general, at the Aquarium." Id. These failures "belie[d] any possible assertion that either of them had established a relationship with Kama such that, as a result of his transfer, 'the very subject of [the member's] interest will no longer exist.' " Id. (quoting Lujan, 504 U.S. at 566, 112 S.Ct. 2130 ).
The above precedent persuades this Court that Rowley has sufficiently alleged injury in fact. Rowley makes the following relevant allegations in her complaint:
14. [Rowley] has resided in New Bedford, MA for over five years and in the Zoo's market area for 11 years. She is also a member of the Buttonwood Park Zoological Society located at the Zoo. Ms. Rowley visited the Zoo on a near daily basis for the past three and one-half years to observe Ruth and Emily and communicates with them regularly. Prior to that she visited the Zoo on a weekly and monthly basis since 2010.
15. Ms. Rowley has developed an aesthetic, emotional, and spiritual relationship with Ruth and Emily over the years. Any enjoyment she has from befriending the elephants is greatly diminished by observing their ongoing suffering from their captivity.
16. Plaintiff Friends[1] have demonstrated, protested, and handed out educational literature at the Zoo ... to inform and educate the public about Ruth and Emily's living conditions over the past five years.
17. Plaintiff Friends' members have voiced concerns through letters to the local newspapers, social media and email about Ruth's and Emily's health and living conditions at the Zoo.
...
19. Plaintiff Friends were so concerned that they raised $800 in 2015 to have "Ele-coats" handmade and shipped to the Zoo for Ruth and Emily to wear in the winter, when they are forced to stand on exhibit in snow, ice and freezing temperatures.
20. Plaintiff Friends were so concerned about the lack of medical care for Ruth that they raised approximately $2,000 to bring a veterinarian with 40 years of elephant expertise to the Zoo in 2015....
Compl. ¶¶ 14-17, 19-20. Rowley's allegations that she lives in New Bedford, is a member of the Zoo's Zoological Society, and observes and communicates with Ruth and Emily on a "near daily basis" are akin to the evidence relied on by the courts in Friends of the Earth, Animal Welfare Institute, and Strahan to establish injury in fact. While she does not explicitly state that she intends to return to the Zoo, construing all inferences in her favor (as is warranted at this stage), one may reasonably conclude from the occasional use of present tense and overall tenor of her allegations that she has "concrete plans" to continue her frequent visits to the Zoo, rather than only " 'some day' intentions" to return. Lujan, 504 U.S. at 564, 112 S.Ct. 2130 ; see also *37 Hardaway v. District of Columbia Hous. Auth., 843 F.3d 973, 978 (D.C. Cir. 2016) ("constru[ing] liberally" pro se plaintiffs' complaint to determine that it alleged injury in fact).
Rowley also alleges that she has a relationship with and an ongoing interest in observing these particular elephants, rather than simply alleging that she has observed some elephants at the Zoo. Cf. Citizens to End Animal Suffering & Exploitation, Inc., 836 F.Supp. at 52 ("More significantly, the affiants have not alleged the particular relationship with Kama necessary to cause them to be harmed by his absence even if they plan to return to the Aquarium."). Rowley's complaint alleges that the Zoo's maltreatment of Ruth and Emily has injured this interest because "[a]ny enjoyment she has from befriending the elephants is greatly diminished by observing their ongoing suffering from their captivity." Compl. ¶ 15; see Animal Legal Def. Fund, Inc. v. Glickman, 154 F.3d 426, 433 (D.C. Cir. 1998) (en banc) (observing that "people have a cognizable interest in 'view[ing] animals free from ... inhumane treatment' " (quoting Humane Soc'y v. Babbitt, 46 F.3d 93, 99 n.7 (D.C. Cir. 1995) ) ). Her alleged injury thus appears most similar to the one that Justice Scalia indicated would pass constitutional muster. See Lujan, 504 U.S. at 566, 112 S.Ct. 2130 ("It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist.").
Overlooking this circuit's precedent on the matter, New Bedford relies on Animal Legal Defense Fund, Inc. v. Glickman, a case from the District of Columbia Circuit, to argue that Rowley has not adequately established injury in fact because she has not alleged that she has any specialized training in wildlife or animal welfare. Def.'s Mem. 2-3. In Glickman, the court affirmed the ruling that an individual plaintiff alleging "aesthetic injury" from observing captive animals living under inhumane conditions had standing. 154 F.3d at 429. New Bedford maintains that the Glickman court "relied on the fact that the [p]laintiff had received specialized training and had significant experience in wildlife rehabilitation" in finding that he had suffered injury in fact. Def.'s Mem. 2. Yet Glickman does not reference, much less rely on, this fact in its reasoning at all. See id. at 431-38. New Bedford appears to have concocted this theory from the court's factual summary of the plaintiff's affidavit, which merely mentions that the plaintiff had training in wildlife rehabilitation and had worked for various animal relief and rescue organizations. Id. at 429. Nowhere in Glickman's thorough analysis of the applicable case law does the court even hint that a plaintiff's specialized training or expertise is relevant to establishing injury in fact, and New Bedford does not point this Court to any other case so stating.
In fact, the Glickman court's analysis only bolsters this Court's conclusion that Rowley has shown injury in fact. In determining that the plaintiff's allegations "solidly establish injury in fact," the court explained that the plaintiff "enjoy[s] seeing [animals] in various zoos and other parks near [his] home" due to his "familiarity with and love of exotic animals, as well as for recreational and educational purposes and because [he] appreciate[s] these animals' beauty." Id. at 431. Like Rowley, the Glickman plaintiff visited the zoo in question "regularly" and "developed an interest ... in seeing these particular animals living under humane treatment." Id. The court explained that these allegations established "far more than an abstract, and uncognizable interest in seeing the law enforced." Id. at 432.
*38 New Bedford next argues that Rowley has not produced evidence that she has observed or will observe Asian elephants in their native lands. Def.'s Mem. 3. This argument suffers from a similar flaw in that it imports a nonexistent requirement into the injury in fact analysis. The fact that some cases have involved plaintiffs who have based their theories of injury on the observation of a species in its natural habitat, see, e.g., Lujan, 504 U.S. at 563-64, 112 S.Ct. 2130, does not compel the conclusion that all plaintiffs must demonstrate that they have observed, or will observe, a species in its natural habitat. None of the cases known to this Court require such a showing, and New Bedford does not offer any that do. Rowley has sufficiently established injury in fact.
B. Causation
The second requirement of standing is "a causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560, 112 S.Ct. 2130. That is, Rowley must show "that the injury is fairly traceable to [New Bedford's] allegedly unlawful actions." Animal Welfare Inst., 623 F.3d at 25 (quoting Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 26 (1st Cir. 2007) ). In her complaint, Rowley alleges that the Zoo:
(1) keep[s] Ruth & Emily in a facility ... that interferes with normal behavior; (2) confin[es] them in a small enclosure and even smaller "barn" with bars and hard substrates that cause physical and psychological harm; (3) prevent[s] them from having appropriate social interactions with each other and other elephants; (4) fail[s] to protect Ruth from Emily's aggression which causes Ruth physical and psychological harm; (5) fail[s] to provide adequate veterinary care which harms both Ruth and Emily; (6) fail[s] to provide proper food and enrichment.
Compl. ¶ 10. New Bedford claims that because the Zoo has in fact not mistreated the elephants, Rowley cannot show that its conduct has caused any harm. Def.'s Mem. 3-4. Whether or not Rowley will ultimately succeed in proving her allegations of harm, however, is irrelevant at this stage. Rowley has sufficiently alleged that the Zoo's actions cause the harm complained of by "interfer[ing] with [Ruth and Emily's] natural state" and "increas[ing] [their] risk of death." Animal Welfare Inst., 623 F.3d at 25.
C. Redressability
Finally, Rowley must show that "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (quoting Impson, 503 F.3d at 26 ). This requirement has been held to have been satisfied through requests for injunctive relief. See, e.g., id. at 26 ; Strahan, 939 F.Supp. at 979. Similarly, here, Rowley requests a declaratory judgment that the Zoo's treatment of Ruth and Emily violates the Endangered Species Act, as well as injunctions prohibiting the Zoo from euthanizing the elephants and continuing to violate the Endangered Species Act.[2] Compl. at 25. Were the Zoo to improve its facilities for Ruth and Emily, protect them in the appropriate manner, and provide adequate veterinary care and nutrition, it is likely that Ruth and Emily would suffer less harm and face a decreased risk of illness or death. Thus, a favorable decision is likely to redress Rowley's *39 injury. See Glickman, 154 F.3d at 443 ("Tougher regulations [in compliance with federal law] would either allow [the plaintiff] to visit a more humane Game Farm or, if the Game Farm's owners decide to close rather than comply with higher legal standards, to possibly visit the animals he has come to know in their new homes within exhibitions that comply.").
New Bedford contends that Rowley has not established redressability because her complaint proposes the relocation of Ruth and Emily to a sanctuary in Tennessee, yet she "has not alleged that she would travel to Tennessee" or "stated how she would personally benefit by the proposed relocation." Def.'s Mem. 5. This Court need not determine whether such allegations are necessary, however, because while Rowley's complaint at times urges this relocation, it does not actually seek this relief. Instead, it requests that this Court enjoin the Zoo's alleged unlawful taking, possession, and mistreatment of the elephants and declare its practices unlawful. See Compl. at 25. Further, there has been no indication that the elephants' fate rests in part with agencies not involved in this lawsuit or government initiatives outside New Bedford's control. See Lujan, 504 U.S. at 568-71, 112 S.Ct. 2130. The Zoo is the custodian of these two elephants, and New Bedford, the Zoo's owner, is a party to this case. If Rowley prevails, the Court may order New Bedford to take certain actions that would likely provide full relief to Rowley's injury.
New Bedford next argues that Rowley's injuries are unlikely to be redressed by the Court because Ruth and Emily fall into an exemption from the Endangered Species Act's requirements. Def.'s Mem. 5-6. The Endangered Species Act does indeed exempt certain wildlife from some of its provisions:
The provisions of subsections (a)(1)(A) and (a)(1)(G) of this section shall not apply to any fish or wildlife which was held in captivity or in a controlled environment on (A) December 28, 1973, or (B) the date of the publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title: Provided, That such holding and any subsequent holding or use of the fish or wildlife was not in the course of a commercial activity.
16 U.S.C. § 1538(b)(1). New Bedford asserts that because Ruth and Emily have been held in captivity prior to either of the applicable dates, the statute exempts them from coverage.
This argument might carry weight if Rowley were claiming violations of subsections (a)(1)(A) or (a)(1)(G) of section 1538. Her complaint, however, alleges violations of subsections (a)(1)(B), prohibiting the unlawful "taking" of an endangered species, and (a)(1)(D), prohibiting the possession of such an unlawfully taken species. Compl. ¶ 9. The statute's plain language indicates that the exemption does not apply to these subsections. See American Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus, 502 F.Supp.2d 103, 108-09 (D.D.C. 2007) (analyzing the statute's language and congressional intent to conclude that the exemption applies only to subsections (a)(1)(A) and (a)(1)(G) ). Consequently, this statutory exemption does not disturb the Court's conclusion that Rowley's claims are redressable.
IV. CONCLUSION
For the foregoing reasons, the Court finds that Rowley has sufficiently demonstrated standing to pursue her claims. New Bedford's motion to dismiss, ECF
*40 No. 7, is DENIED. This case has already dragged on far too long. Since Rowley seeks preliminary injunctive relief, it is appropriate in this instance that such hearing be joined with trial on the merits pursuant to Federal Rule of Civil Procedure 65(a). The Court will convene a status conference as soon as possible to set an early trial date.
SO ORDERED.

Given that Rowley has alleged that she is the founder and president of Friends, Compl. ¶ 9, and is now the substituted plaintiff, the Court considers it reasonable to infer that she was involved in the activities attributed to Friends in the complaint.

Rowley has also recently moved for a preliminary injunction based on allegations of Ruth's declining health, seeking a court order enjoining the Zoo's continued allegedly unlawful possession of Ruth and mandating Ruth's assessment by an expert. Mem. Supp. Prelim. Inj. 6, ECF No. 28.